IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAMON LYNCH               :
    Plaintiff         :
                      :
v.                        :        CIVIL NO. L-05-2273
                      :
                      :
GRAUL'S MARKET            :
    Defendant         :

## MEMORANDUM

This employment case tests whether Defendant Graul's Market ("Graul's") discriminated against Plaintiff Damon Lynch by enforcing its employee grooming policy, which forbids beards, long hair, and braids, known as "cornrows." Although on the path towards obtaining a job, Lynch declined an invitation to the final phase of Graul's interview process because he refused to cut his cornrows and shave his beard. Lynch filed suit, raising (i) a disparate treatment claim under both Title VII and 42 U.S.C. § 1981, (ii) a disparate impact claim under Title VII, and (iii) a retaliation claim under Title VII.[1] Following discovery, Graul's moved for summary judgment.

As is more fully stated below, each of Lynch's claims fail as a matter of law. Lynch's disparate treatment claim fails because Graul's had a legitimate reason, Lynch's refusal to comply with its grooming policy, for failing to hire Lynch. While Graul's policy of forbidding beards could support a disparate impact claim, Lynch cannot establish such a claim because he also refused to cut his cornrows. Finally, Lynch's retaliation claim fails because he offers no evidence that anyone at Graul's applied the

---

[1] On February 26, 2007, Lynch filed a motion to amend his complaint to add a retaliation claim. The Court denied Lynch's motion to amend but allowed Lynch to argue his retaliation claim in his opposition to Graul's Motion for Summary Judgment.

1

grooming policy differently to Lynch because he wrote a letter that complained that the grooming policy was discriminatory.  Accordingly, the Court will, by separate Order, GRANT Graul's Motion.

## I.    BACKGROUND

### A.    Graul's Grooming Standards

Graul's is a family owned grocery store with six locations, all of which are in Maryland.  Graul's employees must comply with a grooming policy, which prohibits beards, long hair, and cornrows.  Graul's has only exempted two individuals from its grooming policy: Gary Wellington, an African American, and Robert Martinek, a Caucasian.[2]  Wellington and Martinek developed skin conditions while working at Graul's and both stopped shaving.  Graul's allowed both to continue working at Graul's with beards.[3]

It is unclear how many applicants Graul's has turned away on account of its grooming policy.  In his opposition to Graul's Motion for Summary Judgment, Lynch submitted the affidavit of Jerriel Lyles, an African-American, who claims that Graul's did not hire him because he was unable to shave his beard due to a skin condition and because he was unwilling to cut his cornrows.  Graul's argues that the Court should strike Lyles's affidavit because Lynch did not disclose Lyles as a "person with knowledge"

---

[2]    Graul's allowed Daniel Mundroff, a Caucasian, and Jorge Cruz, a Hispanic-American, to interview with long hair.  The Company allowed John Shaw, a Caucasian, to interview with a beard.  Nevertheless, Graul's required each of these men to comply with the grooming policy before beginning work.

[3]    Martinek provided Graul's with a note from his doctor explaining his condition. Graul's asked Wellington to bring in a note from his doctor, but he did not do so. Wellington's supervisors periodically asked him to bring in a doctor's note but did not otherwise discipline him.  Eventually, Wellington's condition improved to the point where he could resume shaving often enough to comply with Graul's policy.

during discovery and Graul's, therefore, did not have the opportunity to depose Lyles. The Court agrees and, therefore, strikes Lyles's affidavit. Striking Lyles's affidavit, however, does not affect the outcome of the case because, as stated below, Lynch failed to meet a legitimate grooming requirement when he refused to cut his cornrows.

### B.      Lynch's Interview

Lynch is an African-American man who wears his hair in cornrows and claims that he suffers from a skin condition called pseudofolliculitis barbae ("PFB"), which predominantly affects African-American men and prevents them from shaving.[4] On September 13, 2004, Lynch interviewed for a stock clerk position at Graul's with Wendy Stierwalt, a human resources consultant.

At Lynch's interview, Stierwalt explained Graul's grooming policies to Lynch and told him that Graul's employees may not wear beards or cornrows. Lynch told Stierwalt that he could not shave because of a "skin condition," but did not specifically mention that he had PFB. Lynch also argued that he should not have to cut his cornrows to obtain a position at Graul's. Stierwalt nevertheless told Lynch that he could proceed to a "preview," the final phase of the interview process.[5]

On September 14, 2004, Lynch wrote Graul's a letter. In the letter, Lynch stated that he had been told during his interview that he would have to "cut his beard and

---

[4]    Lynch submitted a record from a visit to the Emergency Room at Good Samaritan Hospital of Maryland. The record states that Lynch suffers from "Folliculitis." The parties dispute whether PFB and Folliculitis are different conditions, or whether PFB is a form of Folliculitis. At the summary judgment stage, the Court must assume Lynch suffers from PFB. Had this case gone to trial, Lynch would have been obligated to prove this point.

[5]    At a "preview," the applicant works for a half day at the position for which he has applied.

braids" before his preview and that this made him "feel awkward." The letter went on to ask Graul's to "change [its grooming] policy" so he could attend his preview. Lynch did not mention his skin condition in his letter. At some point between September 14th and September 17th, Stierwalt received Lynch's letter. Stierwalt discussed the letter with Dennis Graul, the president of Graul's, shortly after she received it.

On September 15, 2004, Stierwalt called Lynch to set up a preview. During their conversation, Lynch reiterated that he was unwilling to shave his beard or cut his cornrows. Stierwalt suggested that Lynch discuss the matter with Anthony Webb, the store manager at Graul's Ruxton Road location in Towson, Maryland, where Lynch was to have his preview. She told Lynch that Webb could better explain the grooming policy to him. Neither Stierwalt nor Graul had informed Webb of Lynch's letter.

Lynch called Webb, who is African American, and again stated that he was unable to shave his beard because he had a skin condition and that he was unwilling to cut his cornrows. Webb told Lynch that there was no need to waste anyone's time by proceeding with the preview if Lynch was unwilling to comply with Graul's grooming policies. According to Lynch, Webb also said that Lynch could not attend his preview while wearing either a beard or cornrows. It is unclear whether Lynch told Webb that he would come to the preview. Nevertheless, Webb told Lynch that he would "love to have him" and that he had scheduled Lynch's preview for September 17, 2004. Webb did so with the hope that Lynch would agree to conform to Graul's grooming policy and appear at the preview. Lynch did not come to the preview, however.

4

**II.     ANALYSIS**

   **A.     Standard of Review**

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

   **B.     Disparate Treatment**

Claims under § 1981 and Title VII are analyzed under the same framework.  See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989).  Accordingly, the familiar burden-shifting standard that the Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to Lynch's claims of intentional discrimination under both Title VII and § 1981.  To survive the summary judgment stage, a plaintiff must establish a prima facie case by showing:  (i) that he belongs to a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, he was

rejected for the position under circumstances giving rise to an inference of discrimination. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005).

If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  If the defendant provides such a reason, the plaintiff must then produce evidence that the proffered reason was a pretext.  See Gillins v. Berkeley Electric Cooperative, Inc., 148 F.3d 413 (4th Cir. 1998).  Although the burden of production shifts, the ultimate burden of proving discrimination rests with the plaintiff.  See Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996).

Lynch is a member of a protected class, and he applied for a job opening at Graul's.  In analyzing Graul's Motion for Summary Judgment, the real focus is on (i) whether Lynch's refusal to comply with Graul's grooming policy rendered him unqualified, and (ii) whether he was rejected under circumstances giving rise to an inference of discrimination.[6]  While, as stated below, a grooming policy can be a legitimate job qualification provided the employer allows individuals suffering from PFB

---

[6]   Graul's argues that Lynch is not qualified for the position of stock clerk because he falsified his resume and committed tax fraud.  Graul's, however, did not learn of the information on which it bases its allegations until discovery.  An employer cannot use evidence of wrongdoing discovered after it makes its employment decision to avoid liability for discrimination.  See McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 358 (1995).
   Lynch argues that because Graul's has no evidence that Lynch lied on his resume and committed tax fraud, the Court should strike the relevant portions of Graul's motions and accord Lynch sanctions.  See Motion to Strike Portions of Defendant's Pleadings Filed in this Litigation and Motion for Sanctions (Docket No. 86).  While Graul's claims may be weak, the evidence does provide them some support.  Accordingly, Lynch's Motion is DENIED.

to wear beards, the Court must analyze whether the application of Graul's policy to Lynch raises an inference of discrimination. The Court finds that it does not.

Both Stierwalt and Webb found Lynch qualified save for his apparent refusal to comply with Graul's grooming policy. Webb told Lynch that he would "love to have him." Stierwalt and Webb invited Lynch back for a preview, and if Lynch had performed capably at the preview, Graul's would have hired him. Thus, the only stumbling block was Graul's grooming policy.

The grooming requirements were part of a long-standing policy that Graul's applied evenly to its racially-mixed workforce. See Booth v. Maryland, 327 F.3d 377, 383 (4th Cir. 2003) (denying a § 1981 disparate impact claim because the Defendant granted exceptions to its grooming policy to both a Caucasian and an African American). Graul's has applied its grooming policy to African Americans such as Lyles and Lynch. Graul's, however, has also applied its grooming policy to non-African Americans. Graul's required two employees, Daniel Mundroff, a Caucasian, and Jorge Cruz, a Hispanic American, to cut their long hair. The Company also required John Shaw, a Caucasian, to shave his beard.[7] Graul's has only granted two exceptions to its grooming policy: one to a Caucasian, Martinek, and one to an African American, Wellington.

Accordingly, no rational jury could infer that Graul's refused to hire Lynch for discriminatory reasons. Lynch's disparate treatment claim, therefore, fails.

---

[7] Graul's allowed Shaw, Cruz, and Mundroff—but not Lynch—to attend their previews while in violation of Graul's grooming policy. Graul's required Shaw, Cruz and Mundroff, however, to comply with Graul's grooming policy before beginning work full time. According to Dennis Graul, had they, like Lynch, stated at their initial interview that they would not conform to Graul's grooming policy before beginning work, Graul's would have required them to comply with the grooming policy before coming in for a preview. Thus, for all practical purposes, Graul's applied its grooming policy to Shaw, Cruz, and Mundroff to the same extent as it did to Lynch.

**C.     Disparate Impact**

To succeed on a disparate impact theory, Lynch must first show that Graul's grooming policy has "a significantly adverse impact" on African-American applicants. Connecticut v. Teal, 457 U.S. 440, 446 (1982).  If Lynch demonstrates that Graul's grooming policy causes a significantly adverse impact, Graul's must then show that "business necessity" justifies its policy.  Id. at 446-447.

Were the no-beards policy the only grooming issue in the case, Lynch's claim would survive summary judgment.  Courts have generally held that a prohibition against beards has a "significantly adverse impact" on African Americans because PFB predominantly affects that racial group.  Thus, the case law generally requires a no-beards policy to have an exception for individual who suffer from PFB.[8]

Graul's had granted medical exceptions to its grooming policy in the past, but Lynch was not advised of this fact.  Thus, a trial would have been required to determine the parameters of Graul's policy, the extent of the medical exception, and whether—had Lynch provided medical documentation—Graul's would have granted him a medical exception.  Moreover, a trial would have been required to test Graul's purported business justification—food safety—for its grooming policy.[9]

---

[8]     Compare Green v. Safeway Stores, 1998 WL 898366 at *6 (N.D. Cal. 1998) (finding no disparate impact because the defendant's no-beards policy had an exception for PFB sufferers) with Bradley v. Domino's Pizza, Inc., 939 F.2d 610, 613 (8th Cir. 1991) (finding that a "strictly enforced" no-beards policy had a discriminatory impact on black males) and EEOC v. Trailways, 530 F. Supp. 54, 59 (D. Co. 1981) (finding that defendant's no-beards policy would have been allowed had there been a medical exception for PFB).

[9]     The trial would have involved a number of factual issues.  The parties dispute whether Lynch's skin condition, "Folliculitis," is PFB or a different condition.   In addition, Lynch offered no proof, statistical or otherwise, for the proposition that PFB

Graul's is nevertheless entitled to summary judgment on Lynch's disparate impact claim. Title VII does not protect mutable characteristics, such as hairstyle, that can be changed at will. See Earwood v. Continental Southeastern Lines, Inc. 539 F.2d 1349, 1351 (4th Cir. 1976) (holding that because a hair length regulation was not a pretext for discrimination, it did not violate Title VII).[10] Thus, a no-cornrows policy does not violate Title VII unless it is applied in a discriminatory fashion. As stated above, Graul's applies its grooming policy in a race-neutral fashion. Accordingly, the no-cornrows aspect of Graul's policy does not violate Title VII.

In order to challenge a particular employment practice under a disparate impact theory, the plaintiff must meet the employer's other, non-discriminatory requirements. See Melendez v. Illinois Bell Telephone Co., 79 F.3d 661, 668 (7th Cir. 1996). Because Lynch did not satisfy the valid no-cornrows aspect of Graul's policy, his disparate impact claim fails.

**D.     Retaliation**

Finally, Lynch argues that Graul's retaliated against him for writing his September 14 letter. This claim fails as well. To assert a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) the employee engaged in protected activity; (2) the employer took an adverse employment action against the employee; and

---

predominantly afflicts African Americans. He would have been required to develop this point factually at trial. Finally, Lynch applied for a stock clerk position, and the parties dispute whether a stock clerk works around food, or whether Graul's food safety concerns necessitate a no-beards policy even for non-food handlers.

[10]     See also Batson v. Powell, 912 F.Supp. 565, 572 (D.D.C. 1996) ("Title VII protects classes defined by certain immutable traits identified by statute and possessed by certain individuals. Traits or factors specifically within an individual's control are not necessarily protected.").

(3) a causal connection existed between the protected activity and the adverse action." Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997) (internal citation omitted).

There is no evidence that Graul's refused to hire Lynch because he complained about Graul's grooming policy. Graul's insisted that Lynch comply with its grooming policy before and after it received Lynch's letter. Moreover, the last person to talk to Lynch, Anthony Webb, scheduled a preview with the hope that Lynch would change his mind, adhere to the policy, and report to his preview. Accordingly, no reasonable fact-finder could conclude that Graul's retaliated against Lynch by enforcing its grooming policy.

### III.    CONCLUSION

For the foregoing reasons, the Court will, by separate Order, GRANT Graul's Motion for Summary Judgment and DIRECT the Clerk to CLOSE the case.

Dated this 21st day of December, 2007

                                                    /s/
                                      Benson Everett Legg
                                      Chief Judge